# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-1445

SMURFIT NEWSPRINT CORPORATION,
a Delaware corporation,

*Plaintiff-Appellant,*

*v.*

SOUTHEAST PAPER MANUFACTURING
COMPANY, a Georgia partnership,
now known as SP NEWSPRINT COMPANY,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 1026—**James B. Zagel**, *Judge.*

_____

ARGUED OCTOBER 23, 2003—DECIDED MAY 21, 2004

_____

Before MANION, KANNE, and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* Smurfit Newsprint Corporation ("Smurfit") appeals a grant of summary judgment to Southeast Paper Manufacturing Company, now known as SP Newsprint Company ("SP"). The district court held that the "no-prejudice" rule of New York insurance law should apply to the indemnification provisions of an asset purchase agreement, enabling SP to avoid a potential obligation to

indemnify Smurfit. We conclude that, were the New York Court of Appeals presented with this question, it would not apply the rule. We, therefore, reverse the holding of the district court with respect to this issue. The district court also held that SP did not breach the asset purchase agreement, and we affirm that decision.

## I.

Smurfit, a Delaware corporation with its principal place of business in Illinois, is a manufacturer of newsprint. In late 1999, Smurfit decided to sell a paper mill it owned and operated in Oregon. Smurfit solicited bids for a purchaser and settled on SP, a general partnership with corporate general partners in Georgia, Florida, and Virginia.

The parties negotiated and executed an Asset Purchase Agreement (the "APA"). Under the APA, SP agreed to offer employment to substantially all of the employees of the mill who were members of the Association of Western Pulp and Paper Workers Local No. 60 (the "Union") on terms comparable with those in an existing collective bargaining agreement between Smurfit and the Union (the "Smurfit CBA"). SP did not, however, assume the Smurfit CBA. Instead, following closing, SP and the Union agreed to a new collective bargaining agreement (the "SP CBA").

The parties closed on the transaction on November 10, 1999. Shortly after the closing, SP announced that for the calculation of pension benefits paid by SP, it would not credit Union employees' years of service accumulated during the time Smurfit owned and operated the mill. In effect, a hypothetical Union employee who retired two years after SP's purchase of the mill and had worked at the mill for a total of 20 years would not receive, *from SP*, credit in

the calculation of pension benefits for the 18 years Smurfit had been his employer.[1]

After SP's announcement, the Union filed a grievance against Smurfit. The Union alleged that the Union employees were effectively terminated and thus entitled to severance benefits. Under the Smurfit CBA, Union employees were entitled to severance benefits if Smurfit decided to permanently close the mill. An arbitrator heard the grievance and held that, insofar as Smurfit was concerned, the mill had been closed, and thus the Union employees were entitled to severance benefits. The arbitration award was approximately $ 3.5 million. The decision of the arbitrator

---

[1] Pursuant to the Smurfit CBA, the dollar amount payable for each year of service has increased over the years. For example, beginning April 1, 1999, a retiring Union employee would receive $32 per month for each year of employment. Beginning April 1, 2000, a retiring Union employee would receive $33 per month.

Because SP has announced it would not credit years of service while Smurfit operated the mill in the payment of pensions, a Union employee who retired in December 2001, after having worked at the mill for 20 years, would receive two pension checks: one from Smurfit for the years he worked there while Smurfit operated the mill, and one from SP for the years he worked under SP. The checks would be calculated as follows: from Smurfit he would receive $32 per month for each of the 18 years he worked for Smurfit for a total of $576 per month ($32 x 18); from SP he would receive $34 per month (after April 2001, an employee was entitled to $34 per month for each year of service) for each of the two years he worked for SP ($34 x 2). The two checks would amount to $644 per month ($576 + $68). If, however, Smurfit had continued to run the mill until the employee's retirement, he would have received $680 per month ($34 x 20 years of service). Thus, the employee would receive $36 less per month as a result of the transition of ownership.

was confirmed by the United States District Court for Oregon. *Smurfit Newsprint Corp. v. Association of Western Pulp and Paper Wkrs., Local 60*, No. Civ. 01-953-AS, 2001 WL 34043382 (D. Or. Aug. 14, 2001). This confirmation was affirmed by the Ninth Circuit. *Smurfit Newsprint Corp. v. Association of Western Pulp and Paper Wkrs., Local 60*, 59 Fed. Appx. 207 (9th Cir. 2003).

Smurfit paid the award and then made a demand on SP to assume responsibility for the award under the indemnification provisions of the APA. This was the first specific demand for indemnification made by Smurfit, although Smurfit argues that SP was aware of the arbitration. Jack Brandup, the former personnel manager of the mill under Smurfit, had been retained by SP. Smurfit alleges that Brandup was present when the Union demanded severance benefits before closing. Smurfit also claims that it informed SP's management of the Union's demand immediately after closing.

SP refused to indemnify Smurfit and Smurfit filed this action in the District Court for the Northern District of Illinois. Smurfit's complaint contained two alternative counts. In Count I, Smurfit requested a declaration that SP was responsible for the arbitrator's award under the indemnity provisions of the APA. In Count II, Smurfit alleged that SP breached the APA's requirement that SP offer the Union employees employment on terms comparable to the Smurfit CBA.

SP moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). This motion to dismiss was later converted to a motion for summary judgment on both counts. With respect to Count I, SP contended, among other things, that Smurfit failed to give SP timely written notice of the Union's grievance. With respect to Count II, SP contended that the APA's "comparable employment" language

did not require SP to include Union members' prior years of employment with Smurfit in determining their pension benefits.

The district court, after a series of decisions, granted summary judgment in favor of SP on both counts. In interpreting the terms of the APA, the court gave effect to the APA's choice of law provisions and applied New York law. With respect to Count I, the court found that prompt written notice of a demand for indemnification was a condition precedent to SP's indemnity obligations under the APA. The court found that the APA's notice and indemnification provisions were analogous to notice-of-claim provisions in an insurance contract.

Under New York insurance law, notice-of-claim provisions in an insurance contract are presumed to be conditions precedent. Under contract law more generally, if one party's obligations under a contract are subject to a condition precedent on the part of the other party, the first party's obligations are excused if the condition precedent is not met. If, however, a party's obligations under a contract are subject to a duty of the other party, the first party's obligations are excused only where it can demonstrate prejudice to it in the failure of the second party to perform its duty. Because the district court found that the notice requirement of the APA was a condition precedent to SP's obligation to indemnify Smurfit, the court held that SP was not required to demonstrate prejudice when it did not receive earlier notice of the grievance by the Union. The court concluded, therefore, that SP had no obligation to indemnify Smurfit.

With respect to Count II, the court found that the arbitrator's "award was not based on SP's failure to count prior years of service, but rather because Smurfit closed its mill and terminated employees, which triggered severance benefits." As a result, the court held that the employees'

years of service were prior obligations that remained the responsibility of Smurfit under the APA. As a result, there was no breach of the APA in SP's failure to consider prior years of service.


## II.

Smurfit appeals the decision of the district court with respect to both counts. As to Count I, Smurfit argues that notice was not required for a claim of indemnification for payment of severance benefits. Smurfit also argues that, even if notice were required, the district court improperly applied New York insurance law to find that notice was a condition precedent to SP's obligation to indemnify Smurfit. Finally, Smurfit argues that, even if notice were required and were a condition precedent to SP's obligation to indemnify Smurfit, SP waived the written notice requirement because it had actual knowledge of the pendency of the arbitration. With respect to Count II, Smurfit argues that the failure of SP to include Union employees' service while employed by Smurfit in SP's calculation of pension benefits constituted a breach of SP's agreement in the APA to provide employment to Union employees at terms comparable to their employment with Smurfit.

In addition to responding to Smurfit, SP provides alternative grounds upon which this court could uphold the district court's grant of summary judgment. First, SP argues that the notice of indemnification provision was an *express* condition precedent to indemnification. If this were true, the failure of Smurfit to provide prompt notice would have excused SP from its indemnification obligation without resort to the no-prejudice rule. Although the district court rejected SP's argument, it still found that the notice provision was a condition precedent, just not an express condi-

tion precedent. SP also argues that even if this court finds that SP must demonstrate prejudice in not receiving earlier written notice, it can make such a showing. The district court did not decide whether SP was prejudiced by the failure to receive earlier notice.

### A.  Governing Law

This case is premised upon diversity jurisdiction and we must, therefore, determine the governing state law. A federal court sitting in diversity applies choice-of-law rules of the forum state, here, Illinois. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941); *Nelson v. Sandoz Pharmaceuticals Corp.*, 288 F.3d 954, 963 n.7 (7th Cir. 2002). Illinois law holds that the law applicable to a contract is the law intended by the parties. When the parties express that intent (such as through a governing law provision), that express intent is generally recognized. *Hofeld v. Nationwide Life Ins. Co.*, 322 N.E.2d 454, 458 (Ill. 1975) ("Generally, the law applicable to a contract is that which the parties intended, assuming such an intent. When that intent is expressed, it should be followed."). An exception to this general rule arises where the express choice of law "would *both* violate fundamental Illinois public policy *and* Illinois has a materially greater interest in the litigation than the chosen State." *English Co. v. Northwest Envirocon, Inc.*, 663 N.E.2d 448, 452 (Ill. App. Ct. 1996) (emphasis in original).

The APA is governed by New York law. This is the intent of the parties as expressed in § 10.03 of the APA. Section 10.03 provides that, "[t]his Agreement shall be governed by, and construed in accordance with the laws of the State of New York, applicable to contracts executed in and to be performed in that State." We have not been offered any reason to believe that applying New York law would violate

Illinois public policy and that Illinois has a materially greater interest in the litigation than New York. We therefore look to New York contract law to resolve the issues presented.


### B. Notice

SP first challenges the requirement that it must provide prompt notice of a claim for indemnification. Indemnification under the APA is primarily addressed in Article Eight. Section 8.02(a) of the APA covers indemnification by SP.

> Section 8.02  Indemnification by the Purchaser.
>
> (a) [SP] agrees, subject to the other terms and conditions of this Agreements [sic], to indemnify and defend [Smurfit] against and hold [Smurfit] harmless from, against and in respect of any and all claims, liabilities, obligations, losses, costs, expenses, penalties, fines and other judgments (at equity or at law) and damages whenever arising or incurred (including, without limitation, amounts paid in settlement, reasonable attorneys fees and expenses) relating to or arising out of (i) the breach of any representation, warranty, covenant or agreement of [SP] herein, (ii) the Assumed Liabilities, (iii) any fraud, willful misconduct, bad faith or intentional breach of any representation, warranty, covenant or agreement made by [SP] in this Agreement . . . and (iv) the operations of the Business after the Closing Date by Purchaser.

Section 8.02(b) requires Smurfit to give notice to SP where it believes it may be entitled to indemnification.

> (b) [Smurfit] agrees to give [SP] prompt written notice of any claim, assertion, event or proceeding by or in respect of a third party of which it has knowledge concerning any liability or damage as to which may

request indemnification hereunder. [SP] shall have the right to direct, through counsel of its own choosing, the defense or settlement of any such claim or proceeding at its own expense.

The APA also contains a separate section (§ 10.02) on notices that directs Smurfit to provide any notice required under the APA to SP at its headquarters in Dublin, Georgia, with a copy to SP's counsel in Atlanta, Georgia.

Smurfit argues that notice of an obligation to indemnify is not required where it seeks indemnification under § 6.01(c) of the APA. Section 6.01(c) provides as follows:

[SP] shall be responsible for all claims of severance benefits which are properly payable under the terms of [Smurfit's] severance plan as currently in effect (a copy of which has been furnished to [SP]) by (i) any Union Employees, and (ii) any Non-Union Employees that (A) [SP] fails to offer employment with [SP] as of the Closing or (B) are offered employment by [SP] in which the terms thereof are not in compliance with Section 6.01(b) and such Employees do not accept employment with [SP] on such terms. *[SP] agrees to indemnify and hold [Smurfit] harmless from any claims described in the immediately preceding sentence.*

(Emphasis added.) There is no notice requirement in § 6.01(c) or any immediately surrounding section of the APA. Thus, Smurfit argues, there is no notice requirement for an indemnification claim where the indemnification relates to claims for severance benefits. Section 8.02(b)'s notice requirement, Smurfit contends, relates only to claims for indemnification brought pursuant to § 8.02(a).

SP argues, to the contrary, that indemnification under § 6.01(c), at least insofar as this particular claim is con-

cerned, is the same as indemnification for claims under § 8.02, specifically § 8.02(a)(i) (indemnification arising out of the breach of a representation, warranty, covenant or agreement by SP) and (iv) (indemnification arising out of the operations of the mill after the closing date of the APA). Thus, the notice provisions of § 8.02(b) are applicable to Smurfit's claim. The district court agreed and held that §§ 6.01(c) and 8.02(a) were both applicable to Smurfit's claim for indemnification. The district court found that Smurfit's claim for indemnification was covered by §§ 8.02(a)(i) and (iv).

SP also argues in the alternative that, even if indemnification under § 6.01(c) were different than indemnification under § 8.02(a), the notice provision of § 8.02(b) would be directly applicable to § 6.01(c). As SP points out, under § 8.02(b), Smurfit is required to provide SP "with prompt written notice . . . concerning any liability or damage as to which may request indemnification *hereunder*." (Emphasis added.) Section 10.10 of the APA provides that "[u]nless the context of this Agreement otherwise requires . . . (c) references to 'hereof', 'herein', 'hereby' and similar terms shall refer to this *entire* Agreement." (Emphasis added.) SP argues that "hereunder" in § 8.02(b) is a similar term and, thus, the notice provisions of § 8.02(b) apply to a claim for indemnification under § 6.01(c). Smurfit concedes, as we think it must, that "hereunder" is a similar term to "hereof, "herein" and "hereby," but argues that the context of § 8.02(b) requires that its application be limited to claims for indemnification under § 8.02(a).

We hold that notice concerning Smurfit's claim for indemnification is governed by § 8.02(b). That is, Smurfit was required to give "prompt written notice" of its claim under § 6.01(c) as provided in § 8.02(b). We believe that the use of the word "hereunder" in § 8.02(b) is meant to apply

that section's notice requirement to all claims for indemnification by Smurfit. We see no reason why the context of § 8.02(b) requires that its notice provision relates only to an indemnification sought pursuant to § 8.02(a), and Smurfit offers only the conclusory statement that " '[h]ereunder' in section 8.02 must be read to refer solely to section 8.02, and not to any other claims provision, especially not a specific provision that the parties placed at an entirely different part of the APA."

*C. Notice as an Express Condition Precedent*

We turn next to SP's argument that the notice provision of § 8.02(b) was an express condition precedent to indemnification. "A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995). An express condition precedent is imposed by the parties in the terms of the agreement. *Preferred Mortgage Brokers, Inc. v. Byfield*, 723 N.Y.S.2d 230, 231 (N.Y. App. Div. 2001). If SP is correct that prompt written notice of a claim for an indemnification is a condition precedent (express or otherwise) to indemnification, then SP's duty to provide such indemnification never arose. Richard A. Lord, 13 *Williston on Contracts* § 38:6 (4th ed. 2000) ("As a general rule, unless the performance [of a condition precedent] is waived, excused, or prevented by the other party, or unless he or she repudiates the contract, conditions which are either express or implied in fact must be literally met or exactly fulfilled or no liability can arise on the promise qualified by such conditions.").

SP argues that the language of § 8.02(a), making its obligation to indemnify "subject to the other terms and

conditions of this Agreement," is evidence that § 8.02(b)'s requirement of prompt written notice of a claim for indemnification is an express condition precedent. Smurfit argues that "subject to" was not sufficiently clear such that prompt written notice is an express condition precedent.

We agree with Smurfit. Prompt written notice pursuant to § 8.02(b) was not an express condition precedent to SP's obligation to indemnify Smurfit.[2] The New York Court of Appeals has held that "a contractual duty ordinarily will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition." *Unigard Sec. Ins. Co. v. North River Ins. Co.*, 594 N.E.2d 571, 573 (N.Y. 1992). The general language that the obligation of SP to indemnify Smurfit is "subject to other terms and conditions of [the APA]" is not sufficiently precise to make prompt written notice an express condition precedent to indemnification. Although the obligation to indemnify is "subject to other terms and conditions," there is no "clear language" in § 8.02(b) to indicate that notice is an express condition precedent.

---

[2] Unlike the district court, we have some doubt as to whether Smurfit's claim for indemnification is the type of indemnification covered by §§ 8.02(a)(i) or (iv); therefore, even if notice pursuant to § 8.02(b) were an express condition precedent to indemnification under § 8.02(a), because Smurfit's claim for indemnification may not be a type of indemnification covered by § 8.02(a), the "subject to" language of that section may not apply.

We need not resolve these doubts, however, because as we discuss, even if Smurfit's claim for indemnification could be considered the type of indemnification covered by § 8.02(a), the "subject to" language is not sufficient to require notice as an express condition precedent to indemnification.

*D.   The No-Prejudice Rule*

We turn next to the primary argument of the parties: whether New York's no-prejudice rule applies to the APA's notice provisions. Under general New York contract law, "one seeking to escape the obligation to perform under a contract must demonstrate material breach or prejudice." *Unigard*, 594 N.E.2d at 573; *see also American Home Assurance Co. v. International Ins. Co.*, 684 N.E.2d 14, 16 (N.Y. 1997). This rule applies to prompt-notice provisions. *Unigard*, 594 N.E.2d. at 574; *American Home Assurance Co.*, 684 N.E.2d at 16. Thus, as a general matter, SP would have to demonstrate that it was prejudiced by Smurfit's failure to provide prompt written notice before it could rightfully refuse to indemnify Smurfit.

New York, however, has developed a "limited exception," *American Home Assurance Co.*, 684 N.E.2d at 16, for notice provisions in a primary or excess insurance contract. Under this no-prejudice rule, where the insured has not complied with notice-of-claim provisions, an insurer need not demonstrate prejudice before it may refuse to perform its insurance obligations. *Unigard*, 594 N.E.2d. at 573 ("It is settled New York law that the notice provision for a primary insurer operates as a condition precedent and that the insurer need not show prejudice to rely on the defense of late notice."); *see also American Home Assurance Co.*, 684 N.E.2d at 18 (extending the no-prejudice rule to excess insurers). The New York Court of Appeals has offered several rationales for the no-prejudice rule. These include "the insurer's need to protect itself from fraud by investigating claims soon after the underlying events; to set reserves; and to take an active early role in settlement discussions." *In re Brandon*, 769 N.E.2d 810, 813 (N.Y. 2002); *see also Unigard*, 594 N.E.2d at 573.

Here, SP seeks to extend the no-prejudice rule to the notice for indemnification provisions in an asset purchase agreement. The district court agreed. We, however, do not believe that the New York Court of Appeals would permit such an extension. The New York Court of Appeals has consistently referred to the no-prejudice rule as a "limited" exception for insurance contracts. *In re Brandon*, 769 N.E.2d at 813; *American Home Assurance Co.*, 684 N.E.2d at 16; *Unigard*, 594 N.E.2d at 573. We have been directed to no decision of that court, or any other New York state court decision, that has applied the no-prejudice rule outside of the insurance contract context.

SP directs our attention to only one decision applying New York law and invoking the no-prejudice rule outside of the insurance context, and neither party can show that any other state that applies the no-prejudice rule has applied such a rule outside of the insurance context.[3] SP cites a decision of the United States District Court for the Southern District of New York where that court, with limited analysis, extended the no-prejudice rule to an indemnification provision in a non-insurance contract. *See EMI Catalogue P'ship v. CBS/Fox Co.*, No. 86 CIV 1149, 1994

---

[3] This may, in part, be due to the apparent trend away from the no-prejudice rule in favor of a rule requiring an insurer to show prejudice. Citing a Tennessee Supreme Court decision, the New York Court of Appeals has noted that only two states, New York and Colorado, that had considered the issue in the preceding twenty years continued to adhere to the no-prejudice rule and that Colorado has since abandoned the no-prejudice rule. *In re Brandon*, 769 N.E.2d at 813 n.3 (*citing Alcazar v. Hayes*, 982 S.W.2d 845, 850 (Tenn. 1998)); *cf.* Charles C. Marvel, *Modern Status of Rules Requiring Liability Insurer to Show Prejudice to Escape Liability Because of Insured's Failure or Delay in Giving Notice of Accident or Claim, or in Forwarding Suit Papers*, 32 A.L.R.4th 141 (1984).

WL 163700, at *9-10 (S.D.N.Y. Apr. 28, 1994). In that case, the court noted that the indemnitor "was functioning analogously to a primary insurer." *Id.* at *10. The persuasive strength of that opinion, given its limited analysis, is significantly reduced, however, by a decision (albeit, again with limited analysis) of the same court, two years later, refusing to apply the no-prejudice rule to an indemnification provision in another non-insurance contract. *See Red Ball Interior Demolition Corp. v. Palmadessa*, 947 F. Supp. 116, 123 (S.D.N.Y. 1996) ("[D]espite some superficial similarities between the indemnification agreement and insurance contracts, this Court declines to create a new exception to the general rule that contractual obligations are to be construed as independent promises, rather than conditions precedent to performance.").[4]

The policy rationales for the no-prejudice rule have minimal application outside the insurance context. A principal foundation of the insurance business is the necessity of processing claims and making payments to the

---

[4] In its brief, SP argues that reliance on *Red Ball* is misplaced because *Red Ball* relied primarily on the intermediate appellate court decision in *American Home Assurance Co.,* which was later vacated by the New York Court of Appeals, for the proposition that there is a distinction when there is a right but not an obligation to defend against or investigate a claim. SP appears to be mistaken, however. The court in *Red Ball* relied primarily on the New York Court of Appeals decision in *Unigard*, a decision that remains good law. *See Red Ball*, 947 F. Supp. at 123-24. It is of no matter, however: we rely on *Red Ball* solely to show that the only court that has considered the application of New York's no-prejudice rule outside of insurance context has reached two different decisions. We do not adopt or reject the holding of *Red Ball*.

insured. An insurance company can be faced with hundreds, if not thousands, of claims at any given time. Such circumstances require particularly strict standards for processing claims that allow the insurer to allocate its financial and human resources more efficiently. While it is, of course, true that SP, like an insurance company (or any other business), has an interest in protecting itself from fraud and participating in settlement discussions, SP is not routinely engaged in the business of insurance. Therefore, it is not faced with the volume of claims routinely facing an insurance company. We see no reason, therefore, why SP's interest in protecting itself from fraud and its contractual right to participate in settlement discussions is not adequately protected by the more general rule that it must show prejudice from a failure to receive prompt written notice. As SP itself points out, at least one New York court has found prejudice where a delay in notice of an insurance claim precluded an insurer from "a timely investigation . . . and the chance to effect an early settlement." *Hartford Fire Ins. Co. v. Baseball Office of the Comm'r*, 654 N.Y.S.2d 21, 22 (N.Y. App. Div. 1997).[5]

As to the other rationale stated by the New York Court of Appeals for the no-prejudice rule, the need to set reserves, SP is not, as far as the record indicates, required to set reserves comparable to those required of insurance companies under New York law. *See* N.Y. Ins. Law § 1303. SP does state, in passing, that it is required to set reserves but does

---

[5] As we discuss below, we have decided to remand this case to the district court to determine whether SP was prejudiced by Smurfit's delay in providing notice of its claim for indemnification. We do not, therefore, mean to suggest by citing *Hartford* that SP has actually been prejudiced by Smurfit's delay. The determination of whether SP has been prejudiced is for the district court to decide.

not indicate whether those reserve requirements are statutory, contractual, or an accounting practice, or even whether the reserves are in any way related to its indemnity obligation to Smurfit.

We hold that the New York Court of Appeals, were it faced with this question, would not extend the no-prejudice rule to indemnification provisions of an asset purchase agreement. We need not, therefore, consider Smurfit's motion to certify this question of state law to the New York Court of Appeals. In addition, we need not consider Smurfit's argument that, even assuming notice were a condition precedent to indemnification, SP waived its right to notice because it had actual knowledge of its potential liability.

## E.  Actual Prejudice

SP argues that, assuming this court were to find that the no-prejudice rule does not apply and that SP must show prejudice in the failure to receive prompt notice, it can show prejudice. SP concedes, however, that it did not argue actual prejudice in the district court. Although this court may affirm a grant of summary judgment "on any ground that finds support in the record, . . . the ground must have been adequately presented in the trial court so that the non-moving party had an opportunity to submit affidavits or other evidence and contest the issue." *Box v. A & P Tea Co.*, 772 F.2d 1372, 1376 (7th Cir. 1985) (internal citations omitted). That is not the case here. Smurfit did not have the opportunity to present, and the district court did not have the opportunity to consider, an argument that SP suffered no prejudice in the delay in notifying SP of its indemnification obligation. We remand this issue, therefore, to the

district court for it to consider whether SP suffered prejudice as a result of the late notice of its potential indemnification obligation.

*F. Breach of Contract*

We turn next to the question of whether SP breached the APA. As we indicated above, this issue centers on whether SP failed to offer Union employees "terms and conditions comparable to the [Smurfit CBA]" when it announced it would not consider the Union employees' years of service in calculating pension benefits. We hold that SP did not breach the APA and, therefore, we affirm the district court's grant of summary judgment to SP on Count II of Smurfit's complaint.

The terms and conditions of the Smurfit CBA applicable here are those related to an employee's creditable service and his pension benefits. The Smurfit CBA provided for payment of a certain dollar amount per month for each year of "credited service." Under the Smurfit CBA, credited service ran from the most recent date of hire.

As we indicated above, SP did not assume the Smurfit CBA. Instead, SP entered into a new collective bargaining agreement with the Union. The SP CBA is, however, substantially identical to the Smurfit CBA. Importantly, the SP CBA retained the same formula for calculating an employee's benefits: $x$ dollars per month for each year of credited service with credited service being measured from the most recent date of hire.

When SP took over operation of the mill, the most recent date of hire for every employee changed. The APA did not provide for a smooth transfer whereby the employees

(Union and non-union) had one boss one day and another the next. Instead, the employees had to apply for their old jobs and be hired by SP. Prior to closing, SP sent a letter to the Union's president informing him that SP "will consider [for employment] all of the members of the present workforce who submit an application." The effective date for an employee's hiring was the closing date—November 10, 1999.

Thus, the decision of SP to calculate the pension benefits it offered Union employees from the date it took over the mill is in keeping with the terms of the SP CBA, which in turn are identical to the Smurfit CBA. The most recent date of hire for Union employees is now the closing date of the APA. A Union employee's credited service under the SP CBA runs from November 10, 1999. Because SP's calculation of pension benefits—from the most recent date of hire—was identical to the method of calculation of pension benefits utilized by Smurfit, SP did not fail "to offer terms and conditions comparable to the [Smurfit CBA]."

### III.

The no-prejudice rule of New York insurance law is a limited exception to the general principles applicable to contracts governed by New York law. We hold that the New York Court of Appeals would not apply the no-prejudice rule to the indemnity provisions of an asset purchase agreement. We therefore reverse the district court's determination to the contrary and remand this case to the district court to determine whether SP was prejudiced by Smurfit's failure to provide prompt notice of SP's potential obligation to indemnify Smurfit. We affirm, however, the district court's decision that SP has not breached the APA.

AFFIRMED IN PART; REVERSED IN PART

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*